UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                  Plaintiff,

          v.

ALTON DAVIS,
DERRILYN NEEDHAM,
RONALD KNIBBS,
RODERICK GUNN,

                Defendants.

**MEMORANDUM & ORDER**
06 Cr. 911 (LBS)

SAND, J.:

The eight-count Superseding Indictment in this case charges Defendants with offenses related to robberies and murders in the New York metropolitan area.  Defendants Alton Davis and Roderick Gunn have brought motions to dismiss and for other relief.  This opinion evaluates the following motions:  (1) Gunn's motion to dismiss Counts One and Eight of the Indictment on double jeopardy grounds; (2) Davis' and Gunn's suppression motions; (3) Davis' and Gunn's discovery motions; (4) Davis' pro se motion to dismiss the Indictment for vagueness and duplicity; and (5) Gunn's pro se motions for insufficient evidence and speedy trial violation.[1]

**I.      Indictment**

The alleged offenses in this case stem from drug-related robberies and murders that were committed in 2002 and 2003.  The Indictment includes the following charges: (1) Davis and Gunn, together with co-defendants Derrilyn Needham and Ronald Knibbs, are charged with

---

[1] Davis and Gunn have also brought motions for severance to avoid the introduction of co-defendants' implicating statements and prejudicial spillover.  Davis has also brought a motion to dismiss for improper venue.  During oral argument on January 12, 2009, the Court reserved decision on the severance motions until after the Government makes a decision on death penalty designation in this case and denied the motion to dismiss for improper venue without prejudice to renewal at a later point in these proceedings. (Tr. Oral Argument at 20, 23.)

participating in a conspiracy from in or about July 2002 through in or about January 2003 to commit Hobbs Act robberies of suspected drug dealers, including (i) a robbery at a residence located at 194 Locustwood Boulevard, Elmont, New York, on or about October 31, 2002 ("Elmont robbery"); and (ii) a robbery at a residence located at 4385 Wickham Avenue, Bronx, New York, on or about January 21, 2003 ("Wickham robbery"), in violation of Title 18, United States Code, Section 1951 (Count One); (2) Davis, Gunn, and Needham are charged with committing and attempting to commit the Elmont robbery, in violation of Title 18, United States Code, Sections 1951 and 2 (Count Two), (3) Davis, Gunn, Needham, and Knibbs are charged with committing and attempting to commit the Wickham robbery, in violation of Title 18, United States Code, Sections 1951 and 2 (Count Three); (4) Davis is charged with using, carrying, and discharging a firearm during the Elmont robbery, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2 (Count Four); (5) Davis is charged with using and carrying a firearm during a crime of violence, the Elmont robbery, and thereby murdering Stephanie Laing, in violation of Title 18, United States Code, Sections 924(j) and 2 (Count Five); (6) Davis, Gunn, Needham, and Knibbs are charged with using, carrying, and discharging a firearm during the Wickham Robbery and aiding and abetting another person in doing so, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2 (Count Six); (7) Davis, Gunn, Needham, and Knibbs are charged with using and carrying a firearm during a crime of violence, the Wickham robbery, and aiding and abetting the use, carrying, and possession of firearms, and thereby murdering Gary Grey, in violation of Title 18, United States Code, Sections 924(j) and 2 (Counts Seven); and (8) Davis, Gunn, Needham, and Knibbs are charged with conspiracy to distribute and possess with intent to distribute marijuana, in violation of Title 21, United States Code, Section 846 (Count Eight).

II.     **Double Jeopardy**

Defendant Roderick Gunn moves to dismiss Counts One and Eight of the Indictment on double jeopardy grounds.  Counts One and Eight charge Gunn with participating in a Hobbs Act robbery conspiracy and a narcotics conspiracy, respectively, which spanned from in or about July 2002 through in or about July 2003.  Gunn argues that an Information to which he pled guilty on December 19, 2003 charges the same conspiracies as Counts One and Eight of the Indictment.  For the reasons set forth below, Gunn's motion for dismissal of Counts One and Eight of the Indictment on the grounds of double jeopardy is denied.[2]

a.     **Factual Background**

On June 20, 2003, Gunn was arrested pursuant to a criminal complaint charging that he was an illegal alien in possession of a firearm in and affecting interstate commerce in violation of federal law.  Beginning in July 2003, Gunn attended multiple proffer sessions with the United States Attorney's Office in an effort to secure a cooperation agreement.  The proffer sessions were held with counsel present and pursuant to a proffer agreement.  The notes of the proffer sessions make clear that Gunn disclosed criminal relationships with several individuals, including Derrilyn Needham and Ronald Knibbs, who are alleged co-conspirators in Counts One and Eight, as well as Javier Robles, Luis Alejandro, Donovan Francis, Chris Quinones, and Joey Figueroa.  (Gunn Ex. A, Notes of Gunn's Statements to Law Enforcement on June 25, 2003, July 2, 2003, August 20, 2003, September 9, 2003, September 24, 2003.)  Gunn also disclosed criminal acts committed by these individuals, including several criminal acts in which he was involved.

---

[2] Because the Court has found that Counts One and Eight are not subject to a double jeopardy defense, we do not reach Gunn's argument that "[w]ere this court to dismiss the conspiracy counts on double jeopardy grounds, it should visit anew the question of whether venue has been established with respect to Count 2, the Elmont robbery." (Gunn Mot. for Sever. at 7).

On December 19, 2003, Gunn pled guilty pursuant to a cooperation agreement ("Agreement") to Information 03 Cr. 1277 (WHP) ("Information").  The Information includes six counts, including two conspiracy counts: conspiracy to commit robberies of narcotics dealers from in or about summer 2001 through in or about summer 2002, in violation of Title 18, United States Code, Section 1951, and conspiracy to distribute an unspecified quantity of marijuana between in or about 2002 and in or about 2003, in violation of Title 21, United States Code, Section 846.  Gunn's Agreement includes an appendix that specifically lists criminal conduct that Gunn informed the police that he was involved in, including six specific robberies that he had committed between the summers of 2001 to 2002.  Gunn also proffered information about robberies in which he was not involved.  Specifically, Gunn apprised the Government that he knew a man named "B"—which the Government discovered is an alias for Defendant Alton Davis—and that "B" had participated in a robbery on Long Island, near the Belmont racetrack, in the fall of 2002 during which a woman named Stephanie was shot.  (Gunn Ex. A, Notes of Gunn's Statements to Law Enforcement on July 2, 2003.)  Gunn did not admit to any involvement in this robbery.  (Gunn Br. 24.)  The six robberies to which Gunn did admit involvement are labeled Exhibit A to the Agreement.

The Agreement also includes Gunn's assurance that his disclosures were truthful and complete.  It provides the following:

> It is understood that the defendant (a) shall truthfully and completely disclose all information with respect to the activities of himself and others concerning all matters about which this Office inquires of him, which information can be used for any purpose; (b) shall cooperate fully with this Office, Bureau of Alcohol, Tobacco, Firearms and Explosives, and any other law enforcement agency designated by this Office; . . . (f) shall bring to this Office's attention all crimes which he has committed, and all administrative, civil, or criminal proceedings, investigations, or prosecutions in which he has been or is a subject, target, party, or witness; and (g) shall commit no further crimes whatsoever. . . .

(Gunn Ex. C, Gunn's Cooperation Agreement of December 16, 2003 at 3.)  With respect to

immunity, the Agreement expressly states that protection is provided only for the crimes set forth

in the Agreement.  It reads as follows:

> [I]f the defendant fully complies with the understandings specified in this
> Agreement, he will not be further prosecuted criminally by this Office for any
> crimes . . . related to his participation as described in Exhibit A to this Agreement,
> to the extent that he has disclosed such participation to this Office as of the date of
> this Agreement.  *This Agreement does not provide any protection against
> prosecution for any crimes except those set forth above.*

(Gunn Ex. C at 4) (emphasis added)

Despite Gunn's assurances that he was truthful and provided full disclosure, Gunn's

disclosure was not complete.  At debriefing sessions after his plea, without counsel present,

Gunn admitted to robberies about which he had not informed the Government prior to his plea.

Gunn specifically admitted to involvement in robberies committed with Alton Davis that resulted

in the murders of Stephanie Laing at Locustwood Boulevard in Elmont, New York and Gary

Grey at Wickham Avenue in Bronx, New York.[3]  (Gunn Ex. D, Notes of Gunn's Statements on

August 14, 2004 and October 25, 2004.)  Gunn also identified Davis for law enforcement

officials from a photo array.

On October 28, 2004, Gunn met with the Government.  With counsel present, Gunn

entered into a proffer agreement and repeated the details of robberies to which he admitted in his

post-conviction debriefing sessions.  In three subsequent proffer sessions, Gunn admitted to

involvement in twelve other drug-related robberies and burglaries that he had not previously

disclosed to the Government.  On August 19, 2005, the Government advised Gunn of its belief

that he breached the Agreement.  The Government also informed Gunn that it was assessing the

---

[3] Those two robberies and the murders committed in their furtherance are charged in the Indictment and are listed as
overt acts in the Hobbs Act conspiracy charge in Count One.

possibility of rehabilitating Gunn as a cooperating witness.  Ultimately, the Government rejected Gunn's offer to cooperate.

### b.  Analysis

The Fifth Amendment provides that "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  "[O]nce a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense."  *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 (2003).  The question presently before this Court is whether the conspiracies charged in the Indictment are factually distinct from the conspiracies to which Gunn pled in the 2003 Information such that prosecution of the Indictment does not constitute double jeopardy.  *See United States v. Maslin*, 356 F.3d 191, 196 (2d Cir. 2004).

We look to a variety of factors in determining whether two conspiracies amount to the same offense.  The factors to be considered are as follows:

> (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1992).  The Court applies these factors with a "lively awareness that no dominant factor or single touchstone determines whether [the compared conspiracies] appear in fact and in law the same."  *United States v. Macchia*, 35 F.3d 662, 668 (2d Cir. 1994) (quotation omitted).

Gunn asserts that Counts One and Eight of the Indictment—the alleged conspiracies with co-defendants Davis, Needham, and Knibbs to commit Hobbs Act robberies of suspected drug dealers from in or about July 2002 through in or about January 2003 and to distribute and

possess with intent to distribute marijuana from in or about July 2002 through in or about January 2003—charge the same conspiracies to which Gunn pled guilty in the Information.[4]  As stated previously, Gunn's Information covered conspiracies to commit robberies of narcotics dealers from in or about summer 2001 through in or about summer 2002 and to distribute an unspecified quantity of marijuana between in or about 2002 and in or about 2003.

The criminal defendant carries the initial burden of putting his double jeopardy claim at issue by making a non-frivolous showing of double jeopardy.  *United States v. Estrada*, 320 F.3d 173, 181 (2d. Cir. 2003).  If a defendant makes this prima facie showing, the burden shifts to the government to prove by a preponderance of the evidence that the conspiracies do not constitute the same offense.  *Id.*  Gunn's papers assert several similarities between the offenses at issue in the Information and the Indictment.  Specifically, both offenses are alleged to be Hobbs Act robbery conspiracies that involved Gunn, Needham, and Knibbs, occurred in the New York metropolitan area, and had the common objective of stealing drugs or drug proceeds from suspected drug dealers.  These similarities are sufficient for Gunn to meet his burden of making a non-frivolous showing of double jeopardy.  However, upon further analysis we find that these similarities exist at a relatively general level.  When the two conspiracies are compared at a "particular level," we find the dissimilarities between the two Hobbs Act conspiracies sufficient to satisfy the Government's burden.  *E.g.*, *Macchia*, 35 F.3d at 668; *Estrada*, 320 F.3d at 173.

Comparing the distinct modes of operation highlights two salient dissimilarities between the two conspiracies: none of the robberies in the Information resulted in murders and none of the robberies in the Indictment included police impersonations.  In evaluating the modes of operation used in the conspiracies, the Court looks to the particular modes employed to further

---

[4]  Gunn only challenges the conspiracy charges, Counts One and Eight of the Indictment.  He does not challenge the related substantive charges, which are distinct offenses for the purpose of double jeopardy analysis.  *United States v. Felix*, 503 U.S. 378 (1992).

the conspiracies and not merely to the general means employed to achieve the broad objectives. *Macchia*, 35 F.3d at 670. As stated above, the conspiracy allegations in the Information concerned robberies of suspected drug dealers in which the robbers generally impersonated police officers and threatened the victims at gunpoint but did not kill them. In contrast, the conspiracy charged in the Indictment did not involve any police impersonation and each robbery resulted in Davis killing the victims of the robberies. Thus, the Court finds that this factor significantly supports the conclusion that the two conspiracies are factually distinct.

Similarly, in considering the overlap of co-conspirators, the Court is concerned with the specific characteristics of the conspiracies at issue. The Court does not merely count the number of overlapping participants; we instead analyze the overlapping participation or nonparticipation in relation to the relevant similarities and differences between the conspiracies. *Macchia*, 35 F.3d at 670. Although there is overlap of co-conspirators between the two conspiracies in the Information and the Indictment, the conspiracy to which Gunn pled in his Information did not include the participation of Alton Davis. Davis is alleged to have led the conspiracy charged in the Indictment and to have killed both of the victims at Elmont and Wickham. Davis' absence is thus particularly relevant because of his role in the conspiracy charged in the Indictment and the fact that the conspiracy to which Gunn pled in the Information did not include the alleged murders that resulted from Gunn's criminal relationship with Davis. Gunn argues that the particularly relevant co-conspirator is Needham, not Davis. Gunn believes that Needham is of particular relevance to the analysis because she played the same role in both conspiracies, providing information about the alleged victims. While Needham may have played a similar role in both conspiracies, we find the absence of Davis to be the primary distinction between the conspiracies given the relevant differences between the two conspiracies outlined above.

The lack of interdependence between the two conspiracies is also evidence that the Government has appropriately identified two separate conspiracies.  Gunn argues that the conspiracies were not interdependent because Needham provided information about the targets to both conspiracies.  However, Second Circuit analysis in similar cases suggests that interdependence should be measured by the dependence of the success of the conspiracies on one another.  *See United States v. Guzman*, 2001 WL 290508, at *55 (2d Cir. Mar. 23, 2001).  In this case, the ultimate success of the alleged robberies pled to in the Information did not have a corresponding effect on the outcome of the robberies attempted by Davis' crew.  *E.g.*, *id.*; *Estrada*, 320 F.3d at 184.

Significantly, the two conspiracies took place over essentially distinct time periods.  Gunn pled guilty to a conspiracy that existed from the summer of 2001 to the summer of 2002.  In the present case, Gunn is charged with a conspiracy that existed from July 2002 until January 2003.  This is not a case where the Government is trying a defendant on a smaller conspiracy wholly contained within the scope of larger conspiracy or where the conduct in the current prosecution was taken into account in a prior proceeding.  *See United States v. Calderone*, 982 F.2d 42, 48 (2d Cir. 1992); *United States v. Annabi*, 771 F.2d 671, 672 (2d Cir. 1985); *United States v. Goris*, 93 Cr. 1026, 1994 WL 394961, at *2 (S.D.N.Y. July 26, 1994).  In this case, the first conspiracy only covered the robberies that did not result in murder and the second conspiracy only includes the robberies that resulted in murder.  In such an instance, where the conspiracy alleging murder is brought second and for a distinct timeframe, the opportunity for prosecutorial abuse is not as great.  *Cf. Macchia*, 35 F.3d at 669 ("[W]here the smaller conspiracy is charged first, there is not the same opportunity for prosecutorial abuse. . . .").

The Second Circuit has remained conscious of prosecutorial abuse (or absence thereof) in

the double jeopardy context because of the "ease with which prosecutors can draft indictments that allege what appear to be separate conspiracies but may actually be parts of an overall conspiracy." *Macchia*, 35 F.3d at 670; *United States v. Mallah*, 503 F.2d 971, 983 (2d Cir. 1974). The absence of prosecutorial abuse is clear in this case. The record supports the conclusion that the Government did not know about Gunn's involvement in either the Elmont or Wickham robberies when Gunn pled to the Information. This lack of knowledge is largely the result of Gunn's misleading statements during his pre-plea proffer sessions. It is uncontested that Gunn did not confess to either the Elmont or Wickham robbery during his pre-plea proffer session despite his guarantee in his plea agreement that he was truthfully and completely disclosing all relevant information regarding these charges.[5] In fact, during his plea allocution, Gunn stated that the conspiracy existed only from the summer of 2001 to the summer of 2002.

The Government's lack of knowledge concerning the Davis robberies further supports our finding that the Indictment does not violate the Double Jeopardy Clause. In a concurring opinion, then Chief Judge Newman observed that "[i]t is . . . likely that the prosecution can avoid a jeopardy defense in those situations where the facts concerning the greater conspiracy became known (and were not reasonably knowable) only after the prosecution for the smaller conspiracy." *Macchia*, 35 F.3d at 673 (Newman, C.J., concurring); *see also Calderone*, 982 F.2d at 48 ("We need not decide whether the Government would be permitted to proceed if it could show that evidence of a larger conspiracy came to its attention only after a prior prosecution for a smaller, wholly contained conspiracy. . . ."). Supreme Court case law in an analogous context also suggests that double jeopardy concerns are mitigated where the facts relevant to the succeeding charge "have not been discovered despite the exercise of due diligence" at the time

---

[5] Gunn's papers concede that he did not confess to either the Elmont or Wickham robberies prior to his plea to the Information. (Gunn Br. at 24.)

jeopardy attached. *Cf. Brown v. Ohio*, 432 U.S. 161, 169 n.7 (1977); *Jeffers v. United States*, 432 U.S. 137, 152 (1977). The record does not reveal a lack of due diligence on the part of the Government.[6]

Gunn's chief argument supporting his double jeopardy defense rests on the scope of the conspiracy in *United States v. Robles*—a case to which he was not a party. 04 Cr. 1036 (GEL). Gunn claims that the scope of the conspiracy to which he pled in the Information can only be fully understood by looking to the evidence in the *Robles* case. *Robles* is essential in understanding the scope of the conspiracy pled to in the Information, Gunn asserts, because *Robles* concerned a conspiracy that was joined by the same hub as the conspiracies to which Gunn pled, even though the groups of parties involved in the two cases contain some different

---

[6] Gunn argues that although he did not confess to the Elmont and Wickham robberies prior to his plea, the Government could have pieced together his involvement in these robberies. From Gunn's pre-plea proffers, the Government was aware that Gunn knew a man named "B"—which the Government discovered is an alias for Defendant Alton Davis—and that "B" had participated in a robbery on Long Island, near the Belmont racetrack, in the fall of 2002 during which a woman named Stephanie was shot (the Elmont Robbery and the shooting of Stephanie Laing). (Gunn Ex. A, Notes of Gunn's Statements to Law Enforcement on July 2, 2003.) Gunn stresses that the Government had interviewed a third party witness, Corey Thompson, prior to Gunn's plea, who testified that he was involved in a conspiracy with several people, including Gunn and Davis, to commit robberies of suspected drug dealers. (Gunn Ex. E at 1336–1340, 1345.) Gunn argues that the Government could have inferred Gunn's involvement in the Davis robberies from Gunn's knowledge of the Elmont robbery and Thompson's statements linking Gunn and Davis.

Gunn's argument fails to establish the Government's knowledge of or lack of due diligence in investigating Gunn's involvement in the Elmont and Wickham robberies and murders. The Corey Thompson interviews, as established in the record, do not suggest that Gunn and Davis were involved in the same robberies. The interview simply establishes that the two traveled in the same circles. This information is rather unremarkable since Gunn admitted to the police that he knew about Davis' robberies—including a shooting at Elmont—but did not admit to any involvement in the robbery. Gunn's forthcoming statements about knowing Davis and about Davis' robberies undermine the argument that Thompson's linking of Gunn and Davis should have tipped the Government off to a criminal relationship between the two. Given Gunn's incentive to be truthful and his guarantee of full disclosure, it was reasonable for the Government to believe that Gunn was not involved in the Elmont robbery with Davis.

Additionally, when Gunn pled to the Information the Government did not have any knowledge of the Wickham robbery, which also resulted in a murder. In fact, the Government did not have any specific knowledge of any offense committed by Gunn beyond what was pled in the Information. *Cf. United States v. Olmeda*, 461 F.3d 271, 285 (2d Cir. 2006) (stating that the court would be "less willing to construe an indictment as a bar to future prosecutions" where the government did not have specific knowledge of additional crimes committed by the defendant); *United States v. Strawser*, 739 F.2d 1226, 1230 (7th Cir. 1984) (holding that general information that could have been used to deduce additional crimes did not constitute "specific knowledge" and thus did not bar subsequent prosecution even though the plea agreement stated that the defendant would not face further prosecution arising from the incident). Given the facts that the Government knew at the time of the Information, we find that its lack of knowledge concerning Gunn's involvement in the Elmont and Wickham robberies did not result from lack of due diligence.

participants.  *See Mallah*, 503 F.2d at 984–85.  Gunn argues that the Double Jeopardy Clause prohibits the Government from bringing charges for conspiratorial activities that fall within the ambit of the conspiracy to which Gunn pled in 2003 and that the *Robles* case establishes that the conspiratorial agreement charged in the Indictment is part of the larger conspiracy for which Gunn was put in jeopardy in his 2003 Information.

The *Robles* trial, which commenced on January 10, 2006, involved four alleged conspirators, Javier Robles, Derrilyn Needham, Luis Sanchez, and Corey Thompson.  The Government charged that between October 2001 and December 2003 an organization with variable membership came together and pooled information for the purpose of committing robberies to obtain drugs or drug proceeds.  (Gunn Ex. E, *Robles*, 04 Cr. 1036, Tr. at 19, 20, 25.)  During the trial, the Government elicited testimony from a cooperating witness, Luis Alejandro, suggesting that Gunn, Needham, and Robles, among others, were acting as partners in directing a larger conspiracy by supplying information concerning the targeting of narcotics traffickers.  (Gunn Ex. E at 173, 218.)  Alejandro testified that different groups of people would then form a robbery crew, impersonate police officers, and rob narcotics traffickers.  (Gunn Ex. E at 158–63, 218, 227–29, 249–255.)  The evidence from Corey Thompson discussed above—which linked Needham, Gunn, and Davis—was also presented at the *Robles* trial.[7]  (Gunn Ex. E at 1336–1340, 1345.)

Based on the testimony in the *Robles* trial, Gunn argues that the conspiracy pled to in the Information is part of the same larger conspiracy as the conspiracy charged in the Indictment.  Gunn stresses two facts in making his argument.  First, the *Robles* trial referred to many of the same actors as the two conspiracies at issue in this motion.  Second, the conspiracy at issue in

---

[7] As noted previously, prior to Gunn's plea Corey Thompson testified that he was involved in a conspiracy with several people, including Gunn and Davis, to commit robberies of suspected drug dealers.  (Gunn Ex. E at 1336–1340, 1345.)

*Robles* spanned from 2001 through 2003, which encompasses the time period of the two conspiracies involved here.  The conspiracies pled to in the Information and charged in the Indictment spanned from 2001 through 2002 and 2002 through 2003.

The Court is not persuaded for several reasons.  First, Davis was not charged in *Robles*. Absent Davis' role in the *Robles* conspiracy, Gunn's argument that the *Robles* conspiracy covers the non-impersonation robberies that resulted in murders is severely weakened.   Second, the Government's lack of knowledge of the allegedly greater conspiracy set forth in *Robles* strongly cuts against Gunn's argument.  If Gunn's argument concerning a larger *Robles* conspiracy is credited, Gunn would be permitted to benefit from misleading the Government prior to his plea to the 2003 Information.

Gunn is essentially attempting to expand the scope of his guilty plea to include robberies that resulted in murder by bootstrapping his plea to the *Robles* case, which was tried well after Gunn's plea.  This is especially noteworthy given the language in Gunn's 2003 cooperation agreement that the agreement does not protect him from prosecution for crimes that he did not disclose prior to pleading to the Information.  Gunn previously avoided liability for the robberies and murders that resulted from his conspiratorial activities with Davis by omitting them from his proffers.  Gunn is now attempting to immunize himself from the consequences of those robberies and murders by bootstrapping his plea to the alleged larger conspiracy charged in *Robles*.

Third, while the Court recognizes the possibility that the two conspiracies could have been properly pled within the parameters of one overarching conspiracy, the Second Circuit has stated that the double jeopardy doctrine does not set forth "a prescription for drafting indictments."  The doctrine instead "draws the Constitutional outer limits of prosecutorial discretion in framing indictments for successive conspiracy prosecutions."  *Macchia*, 35 F.3d at

670.  Given the case law and the facts, the Court is not persuaded that the *Robles* conspiracy requires a finding that the Double Jeopardy Clause is violated by the Indictment.

In concluding that the Indictment charges a distinct conspiracy from the conspiracy to which Gunn pled in the Information, the Court finds particularly persuasive the Second Circuit case *United States v. Guzman*, 2001 WL 290508, at *55 (2d Cir. Mar. 23, 2001).[8]  In *Guzman*, the Second Circuit considered an appeal of a defendant's conviction on two separate counts of conspiracy to murder different members of a rival drug gang.  The defendant argued that convicting him on both conspiracy counts constituted double jeopardy because the shootings were part of an ongoing drug war that targeted members of the rival gang and occurred within the same time frame.  The Court of Appeals rejected this claim, stating:

> While [defendant] argues that four of the eight *Korfant* factors favor him, including offenses charged, overlap of time and location, and similarity of operation, this court has held that at a certain level of generality, the fact that two conspiracies overlap with respect to a number of characteristics, including time frame, geographic locale, participants, and criminal objective does not negate the existence of two conspiracies if there exist sufficient distinctions between the schemes charged.

*Id.* at *55 (citation omitted).  The Court of Appeals found it significant that the two conspiracies involved different overt acts and different participants, had different objectives because they contemplated different victims, and were not interdependent because the success of one conspiracy did not have a corresponding effect on the other. *Id.* at *56.

For the reasons laid out in our *Korfant* analysis, the Court finds this case to be analogous to *Guzman*.  Although both the conspiracy to which Gunn pled in the Information and the conspiracy charged in the Indictment involved schemes to commit

---

[8] Although *Guzman* was decided by nonprecedential summary order, the Court nevertheless finds the case persuasive because of the similarity in factual circumstances between this case and *Guzman*.  *See United States v. Irving*, 554 F.3d 64, 78 (2d Cir. 2009).

Hobbs Act robberies in the New York area and included some overlapping participants, as in *Guzman* the distinctions are more significant than the similarities.  The present case involves a conspiracy that included murders and not merely robberies, took place over different time periods, included different overt acts, targeted different victims, involved a key participant—Alton Davis—who was not involved in the prior conspiracy, and the two conspiracies were not interdependent.  Accordingly, the Court does not find the conspiratorial activity alleged in Count One to be part of the conspiracy to which Gunn pled in 2003.

Gunn also challenges Count Eight of the Indictment on double jeopardy grounds. The overt acts alleged in Count Eight directly relate to the marijuana that was obtained while committing the Davis robbery conspiracy alleged in Count One.  Gunn's briefing makes no arguments as to why Count Eight is not factually distinct beyond his arguments concerning Count One.  As the Government meets its burden with respect to the Davis robbery conspiracy, the Court holds that the Government also meets its burden with respect to the corresponding conspiracy to distribute and posses with intent to distribute marijuana.  For the foregoing reasons, Gunn's motion for dismissal of Counts One and Eight of the Indictment on the grounds of double jeopardy is denied.[9]

### III.    Suppression Motions

Davis and Gunn bring several motions to suppress evidence allegedly seized in violation of their Fourth Amendment right against unreasonable seizures and to suppress statements

---

[9] Gunn has also requested a hearing to determine what the Government's investigation had revealed at the time of Gunn's plea if the Court found relevant the Government's lack of knowledge of the Davis robberies at the time Gunn pled to the Information.  Because the Court's holding rests on the conclusion that the conspiracies are factually distinct, and not merely on the Government's lack of knowledge, Gunn's motion is denied.

allegedly made in violation of their Fifth and Sixth Amendment rights to counsel.  For the reasons set forth below, the motions are denied.

### a. Davis' Motion to Suppress Evidence Seized by the NYPD on October 31, 2002

Based on the Fourth Amendment right against unreasonable seizures, Davis seeks to suppress articles of clothing recovered by NYPD officers from his cousin's apartment.  This motion is denied because Davis has not alleged any facts that would demonstrate standing to challenge the search of a third party's home and because his clothing fell within the plain view exception to warrantless searches.

On October 31, 2002, Davis allegedly participated in the Elmont robbery and shooting of Stephanie Laing.  Laing's boyfriend, who was the target of the robbery, allegedly fired gunshots at Davis, hitting him in the chest and shoulder.  Davis and his alleged confederates fled the area. Davis traveled to his cousin's home on Hinsdale Street in Brooklyn.  The cousin called an ambulance for treatment of Davis' gunshot wounds.  In the course of rendering treatment, the ambulance crew cut off Davis' jeans, t-shirt, and sweater and removed his boots.  (Davis Aff. at ¶ 3.)  The ambulance then took Davis to the hospital for treatment.

The NYPD, treating Davis as a shooting victim, conducted an investigation.  The detectives interviewed Davis, who informed them that his home address was 511 Williams Street in Brooklyn.  During the course of their investigation, the officers conducted canvass interviews in the area where Davis claimed to have been shot and traveled to Davis' cousin's apartment on Hinsdale Street, where the clothing at issue was photographed and seized.  (Gov't Ex. F, NYPD Evidence Report.)

Davis contests that the seizure was not pursuant to a warrant and did not meet the requirements of the plain view doctrine because there was nothing immediately incriminating

about the articles of clothing that were seized.  This argument is insufficient for two reasons.

First, Davis has not met his initial burden of proving standing to contest a search of his cousin's

home.  A Fourth Amendment challenge must demonstrate that the allegedly unconstitutional

search invaded the defendant's legitimate expectation of privacy, not merely that of a third party.

*United States v. Payner*, 447 U.S. 727, 731 (1980).  Davis has not alleged that he lived in the

Hinsdale Street apartment, nor has he alleged any facts, such as free or frequent access to the

apartment, which would demonstrate a legitimate privacy interest in the apartment.[10]  *See United*

*States v. Hamilton*, 538 F.3d 162, 168 (2d Cir. 2008); *United States v. Fields*, 113 F.3d 313, 322

(2d Cir. 1997).  On the contrary, Davis informed detectives that day that his home address was

on Williams Street in Brooklyn.

      Second, Davis' argument that the plain view exception does not apply is without merit.

He contends that the plain view exception is inapplicable because the clothing seized was not an

object with an immediately apparent incriminating character.  This argument mischaracterizes

the law.  Under the plain view doctrine, police may seize evidence without a warrant if three

conditions are met:  (1) the officer lawfully occupies the space from which the object is plainly

seen; (2) the incriminating nature of the object is readily apparent; and (3) the officer has lawful

access to the object itself.  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  In evaluating the

second requirement of the doctrine, courts assess whether the police possessed probable cause to

believe that the object is evidence of crime or contraband.  *United States v. Moreno*, 897 F.2d 26,

32 (2d Cir. 1990).  This requirement is not satisfied when police have to conduct a more detailed

investigation of an item to determine whether it is evidence of a crime—for example, by moving

---

[10] Furthermore, the Government submits that Davis' cousin, the owner of the home, consented to the
search.  When an authorized party consents to a search, neither a warrant nor probable cause is necessary
to justify the search.  *See United States v. Matlock*, 415 U.S. 164, 171 & n.7 (1974).  Davis has not
contested the Government's statements and exhibits indicating the cousin's consent.

a stereo in order to check the serial number to determine whether it was stolen. *Arizona v. Hicks*, 480 U.S. 321, 327 (1987).

The seizure in this case does meet the requirements of the plain view doctrine. Davis' argument that "there was nothing immediately incriminating" about the article of clothing mischaracterizes the plain view doctrine. (Davis Br. at 22.) Although it may not have been apparent that the clothes were incriminating to Davis in the presently charged crimes, at the time of the seizure the police were investigating the shooting of Davis and the police certainly had probable cause to believe that the bloodied clothes were evidence of that crime. The Court thus denies the motion to suppress the evidence seized on October 31, 2002.

**b. Davis' Motion to Suppress the March 2007 Statement**

Davis also moves for suppression of a March 2007 statement made to federal authorities. On October 3, 2006, Davis was indicted in this case. In March 2007, NYPD officers arrested Davis for, among other charges, weapons possession. After learning that state authorities were detaining Davis, the Government obtained a writ of habeas corpus ad prosequendum in order to bring Davis before a federal court. Pursuant to that writ, on March 28, 2007, ATF agents arrested Davis. The Government submits that ATF Special Agent Jason Zamaloff read Davis his *Miranda* rights, which Davis stated that he understood. (Gov't Ex. E, Zamaloff Report.) After receiving his *Miranda* warning, Davis made an extensive post-arrest statement in which he admitted to his participation in the two attempted robberies and murders charged in the Indictment. (Gov't Ex. E.)

Davis argues that this statement should be suppressed because his Sixth Amendment right to counsel had attached, and the Government did not establish a knowing and voluntary waiver of his rights. Specifically, Davis argues that federal agents questioned him in the absence of

counsel on March 28, 2007 and that Agent Zamaloff's report does not explicitly state that Davis waived his right to counsel.  Davis further asserts that he did not sign a waiver of rights form. (Davis Br. at 24 & n.7.)  However, Davis' affidavit neither contests the Agent's report nor states that Davis did not understand his rights as read to him by Agent Zamaloff.

At oral argument, Davis' counsel requested a suppression hearing.  Counsel argued that while an affidavit is required when a defendant requests a suppression hearing on an alleged Fifth Amendment violation, an affidavit is not required when invoking a Sixth Amendment right. (Tr. Oral Argument at 11.)  We find no support in the case law for this distinction between the showing required under the Fifth and Sixth Amendments in order to obtain a suppression hearing.

The Sixth Amendment right to counsel attaches at the "initiation of adversary judicial criminal proceedings," whether that is by way of formal charge, preliminary hearing, indictment, information, or arraignment.  *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).  The right is offense specific, and Davis concedes that the assignment of counsel for his state court charge does not itself bar the government from questioning Davis on other federal charges.  (Davis Br. at 25.) *See McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (finding that invocation of the offense-specific Sixth Amendment right on one charge is not an invocation of the nonoffense-specific Fifth Amendment right on another charge).  For post-indictment questioning—which Davis seeks to suppress—a warning that suffices for *Miranda* purposes is sufficient to advise a defendant of his Sixth Amendment rights.  *Patterson v. Illinois,* 487 U.S. 285, 298–99 (1988).  If the Sixth Amendment right for an offense "has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview" about that offense is ineffective.  *McNeil*, 501 U.S. at 175 (quoting *Michigan v. Jackson*, 475 U.S. 625, 635 (1986)).

The government has the burden of establishing a valid waiver, and doubts must be resolved in favor of protecting the constitutional claim. *Michigan v. Jackson*, 475 U.S. at 633. As discussed above, the Government has submitted the report of the arresting agent, which states that the agent read Davis his *Miranda* rights. Under *Patterson*, this *Miranda* warning was sufficient to advise Davis of his Sixth Amendment rights. 487 U.S. at 298. Davis has not claimed that he requested the presence of counsel, nor does he refute the agent's report that Davis stated he understood his rights.[11] A defendant does not have a right to a hearing on a suppression claim if his moving papers do not "state sufficient facts which, if proven, would have required the granting of the relief requested." *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969); *accord United States v. Warren*, 453 F.2d 738, 743 (2d Cir. 1972). Because Davis does not assert that he invoked his Sixth Amendment right to counsel at any point before or during his conversation with the agent, the motion to suppress the March 2007 statement is denied. The denial is without prejudice to renewal should Davis wish to submit an affidavit asserting that he was not advised of his rights or did not waive his rights.

### c.  Gunn's Motion to Suppress Statements of May 2 and June 25, 2003

Gunn moves to suppress statements that he made to law enforcement on May 2 and June 25, 2003. Because Gunn has not presented evidence contradicting the Government's evidence that Gunn executed written waivers of his *Miranda* rights, we deny the motion to suppress as to both statements.

The factual context of the first contested statement is as follows. In 2003, prior to the May 2 statement at issue, Gunn was arrested on two occasions by the NYPD. The first arrest was on April 4, 2003, where Gunn (using the alias Tyrone Coleman) and another man were

---

[11] Davis' affidavit merely states that no attorney was present with him during the time period when federal agents drove him from Riker's Island to Manhattan, where he was processed and taken to court. (Davis Aff. at ¶¶ 8–9.)

stopped by NYPD officers responding to a report of a man with a gun in an SUV.  The officers searched the car and recovered a loaded handgun and a stun gun.  (Gunn Ex. E, *Robles*, 04 Cr. 1036, Tr. at 741–58.)  After Gunn was arrested, he executed a written waiver of his *Miranda* rights and made a post-arrest statement.  (Gov't Ex. A, Tyrone Coleman Waiver.)  The second arrest occurred on May 1, 2003, when Gunn was charged with participating in an attempted robbery with co-defendant Ronald Knibbs.  (Gunn Ex. E at 830–48.)  Later that evening, Gunn executed a written waiver of his *Miranda* rights and made a post-arrest statement in which he discussed his participation in an attempted robbery of a drug dealer.  (Gov't Ex. B.)  The following day, on May 2, 2003, Gunn was debriefed by NYPD detectives.  In the debriefing, Gunn provided statements concerning individuals who committed robberies by impersonating police officers.  (Gov't Ex. C.)

Gunn moves to have his May 2, 2003 statements suppressed.  We do not find that Gunn has alleged facts that would require a hearing on the issue, and thus we deny this motion.  As discussed above, *supra* section III.b, a defendant is not automatically entitled to an evidentiary hearing if he does not allege facts that, if proven, would require the granting of relief.  The Government has produced a written waiver of Gunn's *Miranda* rights that was signed the evening before the statement at issue.  (Gov't Ex. B.)  Once the *Miranda* waiver has been given, the fact that questioning is stopped and then later resumed does not necessarily create the need for a new warning.  *United States v. Banner*, 356 F.3d 478, 480 (2d Cir. 2004).  Renewed warnings are generally not necessary unless the defendant's circumstances have changed so seriously that the defendant's answers are no longer voluntary or his waiver of rights is no longer knowing and intelligent.  *Wyrick v. Fields*, 459 U.S. 42, 47 (1982).  Gunn has not submitted any evidence indicating that his circumstances had changed between his overnight detainment on

pending robbery charges, during which he signed a written waiver, and the following day when questioning resumed.

Gunn also seeks suppression of his statement of June 25, 2003, when he was arrested on federal charges of firearm possession by an illegal alien. The Government has supplied the Court with a copy of the federal agent's investigation report and of Gunn's written *Miranda* waiver. (Gov't Ex. D, Gunn Waiver.) For reasons discussed above, in light of the Government's evidence that Gunn was read and waived his *Miranda* rights, and Gunn's failure to put forth any evidence or assertions to the contrary, the motion to suppress the June 25, 2003 statement is also denied.

## IV.    Discovery Motions

Davis and Gunn bring various discovery motions for a bill of particulars, disclosure of grand jury minutes, and immediate disclosure of *Brady*, *Giglio*, and Jencks Act materials.

### a.    Motions for a Bill of Particulars

Gunn and Davis request that the Government provide a bill of particulars. Davis seeks further detail on whether, with respect to each of the substantive charges, he is charged as a principal or as an aider and abettor. Davis also requests that the Government specify how the attempted robberies affected interstate commerce and the theory the Government relies upon to demonstrate the conspiracy to distribute marijuana. (Davis Br. at 27, 29.) Gunn also submits a pro se motion for a bill of particulars regarding the alleged effect of the robberies on interstate commerce. (Gunn Pro Se Br. at 14.)

"A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotations omitted). A motion for a bill of

particulars is only granted where it is necessary to "enable[e] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988); *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990). Defendants cannot use a bill of particulars as a discovery tool or as a means to preview the theory of the Government's case. *See United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001); *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y. 1989). The decision whether to order the filing of a bill of particulars is within the sound discretion of the district court. *Walsh*, 194 F.3d at 47.

In this case, the Indictment contains details about the time periods and places of the alleged offenses and describes overt acts allegedly committed in furtherance of the conspiracies. Furthermore, the Government has provided substantial discovery, which includes information about the relevant robberies. The Government has also disclosed that it intends to prove at trial that the targets of the robbery were engaged in interstate drug trafficking, including trafficking of marijuana from California. (Tr. Oral Argument at 26.) We cannot say that the offenses charged or the theory of prosecution is so obscure that Davis or Gunn will be hindered in preparing their defenses.[12] Both motions for a bill of particulars are denied.

### b. Motions for Immediate Production of *Brady* or *Giglio* Material

---

[12] Davis relies on the Second Circuit case of *United States v. Bortnovsky* for support of his argument that without a bill of particulars he will be hindered in preparing his defense. 820 F.2d 572 (2d Cir. 1987). We do not find *Bortnovsky* to be analogous to this case. In *Bortnovsky*, the defendants were charged with mail fraud arising out of their submission of false burglary claims. The government did not disclose which three documents out of the thousands of documents produced in discovery were purportedly falsified, nor did they disclose the dates of the false burglaries. *Id.* at 574–75. The production of "mountains of documents" left defense counsel "unguided" as to which robberies the government would argue were falsified. *Id.* at 575. Defendants in this case are not faced with such a circumstance. The Indictment specifies the overt acts and does not leave Defendants uncertain as to the alleged acts and theories of prosecution.

Gunn and Davis submit requests for production of materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500.  First, both Defendants seek the immediate disclosure of exculpatory material that must be produced under *Brady*.  Courts in the Second Circuit have repeatedly denied such requests where, as here, the Government has made a good-faith representation to the Court and to defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*.  *See, e.g., United States v. Schwimmer*, 649 F. Supp. 544, 549 (E.D.N.Y. 1986) (citing *United States v. Evanchik*, 413 F.2d 950, 953 (2d Cir. 1969)).  The Government has stated that it is unaware, at the present time, of any evidence in its possession that is exculpatory or otherwise favorable to the defense.[13]  The Government has assured the Court and defense counsel that it continues to review evidence and will make such material available—if and when it comes to light—to the defense in time for its effective use at trial.  *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001).  In light of this, the motions for immediate production of *Brady* material are denied.

Second, Gunn and Davis request the immediate production of *Giglio* material that can be used to impeach Government witnesses.  They argue that the complex nature of the case and the seriousness of the charges require that the material be turned over immediately.  The Second Circuit has held that a request for immediate or early disclosure has no basis in the law.  *Coppa*, 267 F.3d at 144.  Impeachment material ordinarily need not be disclosed until the witness is

---

[13] Davis states that the Government possesses information from a cooperating witness that someone other than Davis killed Stephanie Laing.  (Davis Br. at 30.)  Specifically, Davis asserts that in a previous prosecution a cooperating witness named Kevin Holt testified at trial that "Rooster" (an alias for Marlon Campbell) and others robbed and killed Laing.  Such exculpatory information, if indeed in the possession of the Government, must be turned over to the defense in time for its effective use at trial.  However, we find it unnecessary to enter such an order because defense counsel concedes that the Assistant United States Attorney has already agreed to investigate the information regarding Campbell's role in the Laing homicide and to comply with the Government's *Brady* obligation.  (Carvlin Aff. to Davis Br. at ¶ 13.)

called to testify at trial.  *United States v. Nixon*, 418 U.S. 683, 701 (1974).  The reasoning for this timing is that such material "does not ordinarily require any independent investigation in order to [be used] effectively at trial."  *United States v. Jacques Dessange, Inc.*, No. 99 Cr. 1182, 2000 WL 280050, at *9 (S.D.N.Y. Mar. 14, 2000); *see United States v. Wilson*, No. 01 Cr. 53, 2001 WL 727026, at *2 (S.D.N.Y. June 28, 2001).

The Government has represented to the Court and to defense counsel that it intends to provide *Giglio* material no later than the Friday before the testimony of any witness, and where the material is voluminous the Government will provide the material further in advance.  There is no support in the case law for mandating disclosure at this point in time.  Thus, the motions for immediate production of *Giglio* material are denied.

Finally, Gunn requests pretrial disclosure of all Jencks Act material.  This request is baseless as courts cannot compel, over Government objection, the disclosure of Jencks material prior to the witness' testimony on direct examination.  The relevant statute provides:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of [discovery] until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500.  Although the Second Circuit has encouraged pretrial disclosure in complex cases "so that those abhorrent lengthy pauses at trial to examine documents can be avoided," the statute does not enable courts to compel early disclosure.  *U.S. v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974).  We are satisfied with the Government's representation that it will provide Jencks Act material at the same time it provides *Giglio* material—no later than the Friday before the testimony of any witness.  (Gov't Br. at 40.)  Gunn's motion for earlier disclosure of Jencks Act material is denied.

### c.   Motions for Inspection of Grand Jury Minutes

Gunn brings a pro se motion asserting that the Indictment should be dismissed based on irregularities in the grand jury proceedings.  He seeks disclosure of extensive information from the proceedings, including records from the selection and empanelment of the grand jury, the names of the grand jurors, the length of time spent deliberating, and Government statements affirming or denying the usage of certain documents in the grand jury presentation.  (Gunn Pro Se Br. at 10–11.)  Davis joins in Gunn's application and, through his counsel, also asks that the Court inspect and disclose to defense counsel the grand jury minutes.  Finally, Davis asserts that the Indictment should be dismissed because the evidence submitted to the jury was insufficient to establish the jurisdictional element of the Hobbs Act charges.

Review of grand jury proceedings is very limited.  Grand jury proceedings are afforded a "presumption of regularity" that is dispelled "only upon particularized proof of irregularities" in the process.  *United States v. Mechanik*, 475 U.S. 66, 75 (1986).  A party seeking grand jury material must demonstrate a "particularized need" for the material sought.  *United States v. Sells Eng'g*, 463 U.S. 418, 443 (1983).  Absent specific factual allegations of Government misconduct, it is inappropriate for the court to conduct an *in camera* inspection of grand jury minutes.  *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990); *see United States v. Santoro*, 647 F. Supp. 153, 173 (E.D.N.Y. 1986) ("conclusory or speculative allegations of misconduct do not outweigh the presumption of regularity of grand jury proceedings").

Davis does not make any specific allegations of misconduct to support his request for grand jury minutes.  The motion merely speculates that the evidence was insufficient to establish the "effect on commerce" element of the Hobbs Act charges.  Additionally, defense counsel will have an opportunity to challenge the evidence establishing jurisdiction after the government's

presentation of its case at trial. *United States v. Remire*, 400 F. Supp. 2d 627, 632 (S.D.N.Y. 2005). Finally, Davis concedes that this Court lacks authority to dismiss an indictment on this ground. *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998). Davis' request for disclosure and inspection of grand jury minutes is denied.

Similarly, Gunn has not made the required showing that would entitle him to production of grand jury documents. The gravamen of Gunn's claims is that the grand jury would not have indicted him had the Government not provided misleading summaries of witness statements and evidence. However, these allegations are based on Gunn's speculations of misconduct and Gunn has not presented any evidence that the Government knowingly presented perjurious witness statements before the Grand Jury or otherwise engaged in misconduct. *See United States v. Sugar*, 606 F. Supp. 1134, 1143 (S.D.N.Y. 1985) ("[U]nsupported assertions and speculations are not sufficient to require an in-depth review of the evidence before the Grand Jury."). As Gunn offers only unsupported allegations in relation to this motion, we decline to order production of the grand jury minutes.

Gunn makes an additional request for inspection of the records naming the individuals in the Master List from which the grand jury was selected. The relevant statute provides that the contents of records used by the jury clerk for the jury selection process "shall not be disclosed, except . . . as may be necessary in the preparation or presentation of motion [challenging compliance with selection procedures]." 28 U.S.C. § 1867(f); *see also Test v. United States*, 420 U.S. 28, 30 (1975) (a litigant "has essentially an *unqualified* right to inspect jury lists" in order to evaluate the fairness of the jury selection process) (emphasis in original).

However, there is no absolute right of access to all materials relating to grand jury selection. Names of specific jurors selected do not need to be turned over to a defendant,

especially in cases involving violent crimes where the Government has a heightened interest in maintaining the secrecy and sanctity of the grand jury proceeding.  *United States v. Gotti*, No. 02 Cr. 743, 2004 WL 32858, at *11 (S.D.N.Y. Jan. 6, 2004); *cf. United States v. Hansel*, 70 F.3d 6, 8 (2d Cir. 1996) (courts may deny access to grand juror names without violating the right to challenge grand jury selection process).  We deny Gunn's request for access to the names and addresses of individuals on the Master List and on the grand jury.

However, the Court recognizes Gunn's statutory right to information so that he may challenge compliance with jury selection procedure.  As such, we order the production of the District's Master Plan for jury selection.  *See United States v. Harvey*, 756 F.2d 636, 642–48 (8th Cir. 1985) (statutory requirement is satisfied by providing defendant with access to "data relating to the constituency and method of the grand jury selection" but not to names of jurors).

### V.      Davis' Pro Se Motions to Dismiss

In addition to the above motions submitted by counsel, Davis has filed a pro se motion seeking dismissal of Counts Two, Six and Seven of the Indictment for vagueness, Count Eight because it is duplicitous, as well as dismissal of the entire Indictment on the ground that the Government does not establish an effect on interstate commerce as a result of the Hobbs Act robberies.  These motions are denied.

Davis claims that Counts Two, Six, and Seven of the Indictment are vague because they assert that the charged crimes were committed "in the Southern District of New York and elsewhere."  (Davis Pro Se Br. at 3–4.)  An indictment is not vague if it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend. *Alfonso*, 143 F.3d at 776 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). Indictments that "do little more than . . . track the language of the statute charged and state the

time and place (in approximate terms) of the alleged crime" have been found sufficient.  *Id.*  The Second Circuit has refused, absent any showing of prejudice, to dismiss charges for lack of specificity.  *Walsh*, 194 F.3d at 45.

The Indictment as a whole makes it clear that the primary crime charged in Count Two is the attempted robbery at Elmont and that the crimes charged in Counts Six and Seven are the possession and use of a firearm in connection with the robbery and murder at Wickham Avenue. The surplusage language of "and elsewhere" is not vague but reflects the Government's belief that acts in furtherance of the crime occurred in the Southern District and other districts.  Davis cannot show that he is prejudiced by the language or that the Indictment does not provide adequate notice of the crimes charged.  Thus, we do not find that the Indictment is so lacking in specificity as to be vague.  The motion to dismiss Counts Two, Six, and Seven is denied.

Davis also seeks dismissal of Count Eight of the Indictment for duplicity.  An indictment is duplicitous if it joins two or more distinct crimes in a single count, but not if it alleges in a single count the commission of a crime by several means.  *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992).  The doctrine of duplicity is concerned, in part, with providing the defendant with adequate notice and with avoiding the risk that a general verdict of guilty may conceal a finding of guilty as to one crime and an acquittal as to another.  *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981).  Count Eight charges Defendants with conspiracy to violate the narcotics laws of the United States.  The Indictment specifies a time period and place for the conspiracy and sets forth overt acts committed in furtherance of the conspiracy. The count provides adequate notice to Davis of the crime charged and does not join two or more distinct crimes in a single charge.  We thus deny the motion to dismiss Count Eight.

Finally, Davis alleges that the Indictment does not establish an effect on interstate commerce.  As discussed in this section and in section IV.a above, the Indictment contains sufficient detail and the Court will permit the Government to attempt to prove its case at trial. The motion to dismiss the entire Indictment is denied.

**VI.      Gunn's Pro Se Motions**

Gunn raises various issues in his pro se motion, most of which are addressed above.  We now address his remaining pro se motions.  Gunn moves for a dismissal of Counts Two, Six and Seven because the Government has not presented sufficient evidence to support these charges. As addressed in response to Davis' vagueness argument, an indictment is sufficient if it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend.  *Alfonso*, 143 F.3d at 776.  Indictments generally "do little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *Id.*  Gunn's motion does not establish that his conduct, as alleged, would not support liability for the Elmont robbery.  *See United States v. Reddick*, No. 05-13169, 2007 WL 1540210, at *16 (11th Cir. May 29, 2007).  The motion also fails to make any affirmative showing of a deficiency in the Government's case with respect to Counts Six and Seven.  Absent any affirmative showing by Gunn or any claim of prejudice, the Court is inclined to allow the Government to proceed with its case and attempt to prove the elements as alleged in the Indictment.  For the reasons stated above, Gunn's motion is denied.

Gunn also alleges a speedy trial violation, asserting that he was accused—within the meaning of the Sixth Amendment doctrine—when the Government referenced his participation in an alleged felony murder during a proceeding in front of Judge Pauley.  However, Gunn neither alleges any restraint on his liberty nor any other action by the Government that would

30

trigger his right to a speedy trial. *See U.S. v. Marion*, 404 U.S. 307, 313–14 (1971).  The Court

does not find a viable basis for Gunn's claim.

**VII.    Conclusion**

For the foregoing reasons, Gunn's double jeopardy motion is denied, as are Defendants'

motions to suppress.  We deny the discovery motions but order the production of the District's

Master Plan for jury selection to Gunn so that he may submit his challenge regarding compliance

with the jury selection procedure.  The remainder of Davis' and Gunn's pro se motions is denied.

SO ORDERED.

Dated: March 11, 2009
      New York, NY

                                      U.S.D.J.